UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THE CLEARLY FOOD & BEVERAGE CO., INC., | CASE NO. C13-1763JLR |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT |
| v. | |
| TOP SHELF BEVERAGES, INC., | |
| Defendant. | |

## I.   INTRODUCTION

Before the court is Defendant Top Shelf Beverages, Inc.'s ("Top Shelf") motion for summary judgment.  (*See* Mot. (Dkt. # 47).)  This is a trademark case involving two brands of bottled beverages:  "Clearly Canadian" sparkling water and "Clearly Kombucha" fermented tea.  Having considered the submissions of the parties, the balance of the record, and the relevant law, and deeming oral argument unnecessary, the court GRANTS in part and DENIES in part Top Shelf's motion for summary judgment.

ORDER- 1

## II.   BACKGROUND

Unless otherwise noted, the following facts are undisputed.  Plaintiff The Clearly Food & Beverage Co. ("Clearly Food") owns the trademark "Clearly Canadian," United States Trademark Registration No. 1,697,898, as used on "flavored mineral waters, fruit flavored mineral waters, non-flavored mineral waters, carbonated mineral waters, non-carbonated mineral waters, bottled drinking waters, spring waters, soft drinks and fruit juices."  (Resp. (Dkt. # 54)) at 4; Ledden Decl. (Dkt. # 47-3) Ex. 2 ("Assignment").)  Clearly Food obtained this trademark from the now-defunct Clearly Canadian Beverage Corporation ("CC Beverage") in January 2012.  (*See* Assignment.)  CC Beverage sold bottles of flavored sparkling water under the brand name "Clearly Canadian."  (Req. for Not. (Dkt. # 49) Ex. E ("Trustee's Rep.").)  After struggling for several years to compete in the beverage market, CC Beverage filed for bankruptcy in March 2010.  (*Id.*; Req. for Not. Ex. D ("Bank. Filing").)  In January, 2012, the Clearly Canadian trademark was sold to Clearly Food on behalf of CC Beverage's secured creditors.  (Ledden Decl. Ex. 1 ("Not. of Seizure").)  Although by that time the product was no longer being manufactured, Clearly Food intended to "reintroduce Clearly Canadian" by "bringing back the original legacy line in its premium glass teardrop bottle (6+ flavors)."  (Ledden Decl. Ex. 3 ("Khan 8/23/11 Email"), *see also* Ex. 14 ("2012 Bus. Plan") (detailing Clearly Food's product development and pricing, marketing, sales, and distribution strategies, with a goal to "enter full-scale commercial production by March 2013 for North America").)

1    Since then, manufacturing of Clearly Canadian beverages in limited quantities has

2  resumed.  (Dabish Decl. (Dkt. # 56) ¶¶ 2-5.)  Bottles of Clearly Canadian sparkling water

3  have been sold online.  (Colley Dep. (Dkt. # 57-1) at 91:6-92:4.)  Clearly Food is

4  engaged in an online pre-sales campaign directed at consumers, and has also received

5  larger-scale orders from several beverage distributors.  (2d Khan Decl. (Dkt. # 93-13) at

6  ¶¶ 3-5.)  Clearly Food plans to begin selling its products in retail grocery stores in 2015.

7  (*Id.*)

8    Top Shelf was founded by Caleb Cargle and Alison Zarrow in 2009.  (Cargle

9  Decl. (Dkt. # 47-1) ¶ 2; *see generally* Cargle Dep. (Dkt. # 57-3) at 35:17-37:19.)  Top

10  Shelf currently sells a flavored kombucha beverage under the trademarked label "Clearly

11  Kombucha."  (Cargle Dep. ¶ 1.)  Kombucha is a drink brewed from green tea and then

12  fermented with a symbiotic colony of bacteria and yeast.  (*Id.* ¶ 16.)  Mr. Cargle and Ms.

13  Zarrow have developed a unique type of kombucha that is "clear."  (*Id.* ¶ 7.)  That is, due

14  to the filtration process used during brewing, their kombucha is "free from solid 'floaties'

15  typically associated with kombucha [that are] . . . caused by the symbiotic colony of

16  bacteria and yeast."  (*Id.* ¶¶ 6-7.)

17    The co-founders originally sold their product under the brand "Top Shelf

18  Kombucha."  (*Id.* ¶ 9.)  They marketed Top Shelf Kombuhca as a high-end or "premium"

19  mixer and non-alcoholic substitute, and sold it in a miniature champagne bottle.  (*Id.* ¶ 8.)

20  Although supplies were limited by their production capabilities, they believed the sales

21  results "showed promise."  (*Id.* ¶ 10.)

22  *//*

ORDER- 3

1    At the end of 2010, the co-founders changed strategies.  (*Id.* ¶ 12; Zarrow Dep.

2  (Dkt. # 57-5) at 9:11-17.)  After consulting with brand advisors, they decided to

3  differentiate their product from its competitors based on its "clear" character.  (Cargle

4  Decl. ¶ 12; Zarrow Dep. at 12:16-24.)  They also decided that they wanted Top Shelf to

5  be recognized as a socially conscious brewer with transparent manufacturing practices.

6  (Cargle Decl. ¶ 13)  To reflect those goals, they decided to change the name of their

7  product to "Clearly Kombucha."  (*Id.*)

8    The co-founders applied for a federal trademark registration in November 2010,

9  and the "Clearly Kombucha" mark was published for opposition in April 2011.  (Req. for

10  Not. Exs. A, B.)  After the mark was published, the Clearly Kombucha brand launched in

11  Ralph's grocery stores throughout California.  (Cargle Decl. ¶ 14.)  Clearly Kombucha

12  beverages are now sold at various retailers, including, among others, Safeway stores in

13  northern California and the Pacific Northwest, Ralph's stores in southern California, a

14  few Whole Foods grocery stores in Northern California, and PCC natural food stores in

15  Washington and Oregon.  (Cargle Dep. at 73:3-74:12; Zarrow Dep. at 27:21-28.)  Clearly

16  Kombucha is also available for purchase over the Internet.  (Cargle Dep. at 83:21-25.)

17    In September,2013, Clearly Food filed this action against Top Shelf, bringing

18  claims for trademark infringement under the Lanham Act § 32, 15 U.S.C. § 1114, unfair

19  competition under the Lanham Act § 43(a), 15 U.S.C. § 1125(a), trademark dilution

20  under Lanham Act § 43(c), 15 U.S.C. § 1125(c), and trademark infringement and unfair

21  competition under Washington State law.  (*See generally* Compl. (Dkt. # 1).)  Top Shelf's

22  motion for summary judgment on all claims is now before the court.  (*See* Mot.)

# III.    ANALYSIS

## A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where the moving party demonstrates (1) the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party will bear the ultimate burden of persuasion at trial, it must establish a prima facie showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id*. at 1473.

If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In determining whether the factfinder could reasonably find in the nonmoving party's favor, "the court must draw all reasonable inferences in

1    favor of the nonmoving party, and it may not make credibility determinations or weigh

2    the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

3    **B.    Judicial Notice**

4        Top Shelf requests that the court take judicial notice of the following documents:

5    (1) Top Shelf's Trademark Application for the Clearly Kombucha mark, (2) the Notice of

6    Publication of the Clearly Kombucha mark, (3) the Trademark Registration Certificate

7    for the Clearly Kombucha mark, (4) the Combined Declaration of Use and/or Exclusable

8    Nonuse /Application for Renewal of Registration of a Mark under Sections 8 & 9 for the

9    Clearly Canadian mark, (5) the Proposal under the Bankruptcy and Insolvency Act filed

10   in March 2010 by CC Beverage, and (6) the Trustee's Report to Creditors filed in *In the*

11   *Matter of the Proposal of Clearly Canadian Beverage Corporation*, dated March 17,

12   2010.  (*See* Req. for Not. Exs. A-F.)  Top Shelf obtained the trademark documents from

13   the U.S. Patent and Trademark Electronic Search System, and obtained the bankruptcy

14   documents from the Supreme Court of British Columbia (Vancouver Registry).  (*Id.* ¶¶ 6-

15   7.)

16       Rule 201 of the Federal Rules of Evidence permits a federal court to take judicial

17   notice of a fact that is not subject to "reasonable dispute" because it is "capable of

18   accurate and ready determination by resort to sources whose accuracy cannot reasonably

19   be questioned."  Fed. R. Evid. 201(b)(2).  The public records of administrative agencies

20   and other courts are appropriate matters for judicial notice.  *Reyn's Pasta Bella, LLC v.*

21   *Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking notice of court filings); *see*

22   *also Dahon N. Am., Inc. v. Hon*, No. 2:11-CV-05835-ODW, 2012 WL 1413681, at *8

ORDER- 6

1    (C.D. Cal. Apr. 24, 2012) (taking judicial notice of documents filed on the United States

2    trademark website); *CDx Diagnostics Inc. v. Histologics LLC*, No. CV 13-7909-DOC

3    RNBX, 2014 WL 3347525, at *3 (C.D. Cal. July 7, 2014) (collecting cases taking

4    judicial notice of documents from administrative agencies).  Clearly Food has not

5    objected to Top Shelf's request.  Accordingly, for the purposes of this motion, the court

6    grants Top Shelf's request for judicial notice.

7    **C.    Abandonment**

8         "To prove abandonment of a mark as a defense to a claim of trademark

9    infringement, a defendant must show that there was:  '(1) discontinuance of trademark

10   use *and* (2) intent not to resume such use.'"  *Wells Fargo & Co. v. ABD Ins. & Fin.*

11   *Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014), *as amended* (Mar. 11, 2014) (quoting

12   *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 935 (9th Cir.

13   2006)); *see also* 15 U.S.C. § 1127(1).  Non-use for three consecutive years constitutes

14   prima facie evidence of abandonment.  *Herb Reed Enterprises, LLC v. Fla. Entm't*

15   *Mgmt., Inc.*, 736 F.3d 1239, 1247-48 (9th Cir. 2013); 15 U.S.C. § 1127(1).  In the Ninth

16   Circuit, non-use for three consecutive years creates only a rebuttal presumption of

17   abandonment—it does not shift the burden of proof to the trademark owner.  *Abdul-*

18   *Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 411 (9th Cir. 1996).  A trademark owner can

19   rebut the presumption of abandonment by showing valid reasons for non-use or lack of

20   intent to abandon the mark.  *Id.*

21        "The standard for non-use is high."  *Herb Reed Enterprises, LLC*, 736 F.3d at

22   1247-48.  "Non-use requires '*complete* cessation or discontinuance of trademark use.'"

*Id.* (quoting *Electro Source, LLC*, 458 F.3d at 936).  The phrase "trademark use" means use that "includes placement on goods sold or transported in commerce; is bona fide; is made in the ordinary course of trade; and is not made merely to reserve a right in a mark."[1]  *Electro Source, LLC*, 458 F.3d at 936 (quoting 15 U.S.C. § 1127).  Even a "single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith."  *Wells Fargo & Co.*, 758 F.3d at 1072 (quoting *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 804 (9th Cir. 1970)).

Evaluating whether a use is in "the ordinary course of trade" is "often an intensely factual undertaking."  *Electro Source, LLC*, 458 F.3d at 940.  Courts must consider the "totality of the circumstances" to determine if genuine, albeit limited usage of the mark occurred "in the ordinary course of trade."  *Id.*; *Wells Fargo & Co.*, 758 F.3d at 1072.  Relevant factors include the "genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked [products] in an appropriate segment of the public mind as those of the holder of the mark, the scope of the [trademark] activity relative to what would be a commercially reasonable attempt to market the service [or product], the degree of ongoing activity of the holder to conduct the business using the mark, [and] the amount of business transacted."  *Electro Source, LLC*, 458 F.3d at 941 (quoting *Chance v. Pac-Tel Teletrac*

_____

[1] Although "bona fide" is not defined in Section 1127, the Ninth Circuit has noted that "*Black's Law Dictionary* provides two similar definitions for 'bona fide': '1. Made in good faith; without fraud or deceit. 2. Sincere; genuine.'" *Electro Source, LLC*, 458 F.3d at 936 (quoting Black's Law Dictionary at 186 (8th ed. 2004)).  The Ninth Circuit has also noted that "the term 'bona fide' in common parlance means 'made or carried out in good faith; sincere.'" *Id.* (quoting The American Heritage College Dictionary 158 (3d. ed. 2000)).

1  *Inc.,* 242 F.3d 1151, 1159 (9th Cir. 2001)).  "Good faith nominal or limited commercial

2  sales of trademarked goods are sufficient . . . to avoid abandonment[] where the

3  circumstances legitimately explained the paucity of the sales."  *Electro Source, LLC*, 458

4  F.3d at 939.

5      Because abandonment of a trademark is "in the nature of forfeiture, [it] must be

6  strictly proved."  *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515 (9th Cir.

7  2010).  The Ninth Circuit has not determined whether this high standard of proof requires

8  "clear and convincing" evidence or a "preponderance of the evidence."  *Id.*; *see Grocery*

9  *Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 954 (9th Cir. 2007) (separate concurrences

10  disagreeing as to the applicable standard of proof).  The court need not decide which

11  standard of proof applies here because, viewing the evidence in the light most favorable

12  to Clearly Food, Top Shelf fails to carry its burden under either standard.  *See Freecycle*

13  *Sunnyvale*, 626 F.3d at 515 (declining to decide which standard applied to a motion for

14  summary judgment); *Electro Source, LLC*, 458 F.3d at 936 (same).

15      **a.  Relevant facts**

16      Top Shelf contends that the Clearly Canadian mark is presumptively abandoned

17  because "there is no genuine dispute of material fact that there has not been any bona fide

18  use of [the Clearly Canadian trademark] from 2008 to the present day."  (Mot. at 17.)

19  The relevant facts, taken in the light most favorable to Clearly Canadian, *Reeves*, 530

20  U.S. at 150, are as follows.

21      CC Beverage's last full-scale production run of beverages bearing the Clearly

22  Canadian trademark occurred sometime in 2009.  (Ledden Decl. Ex. 8 ("6/3/14 Khan

ORDER- 9

1    Email"); Ledden Decl. Ex. 9 ("12/22/11 Khan Email").)  On September 4, 2009, Clearly

2    shipped 432 cases of Clearly Canadian 20-ounce bottles to Paw Paw Wine Distributors

3    ("Paw Paw") in Michigan.  (Bogen Decl. (Dkt. # 55) ¶ 5, Attach. A.)  In turn, Paw Paw

4    sold Clearly Canadian 20-ounce and 14-ounce beverages to retailers from 2009 through

5    2011.  (*Id.* Attachs. B, C.)  In an August 2009 transaction, GrayCo Sales Limited

6    ("Grayco"), a beverages distributor in Ontario, Canada, sold approximately $225,000

7    worth of Clearly Canadian product to the retailer Big Lots.  (Colley Dep. at 23:6-15;

8    24:19-25:3.)

9         Intrastate Distributors, Inc. ("Intrastate"), a beverage wholesale and manufacturing

10   company located in Michigan, bottled Clearly Canadian product during 2011 and 2012.

11   (Dabish Decl. ¶¶ 2-3.)  Graham Colley, the president of Grayco, maintained a trade booth

12   at the Canadian National Exhibition in 2010 and 2011 featuring Clearly Canadian

13   products.  (2012 Bus. Plan. at 32-33 ("3/30/12 Colley Letter").)

14        In March, 2012, Graham Colley, the president of Grayco, negotiated a license with

15   Clearly Food to sell Clearly Canadian beverages.  (Colley Dep. at 32:22-33:1; 45:7-9;

16   47:15-23.)  Under the license, Grayco was required to pay Clearly Food a royalty for

17   each case of product sold.  (*Id.* at 46:10-47:8.)

18        In 2012, Intrastate filled approximately 1,800 12-pack cases of 11-ounce bottles

19   with Clearly Canadian product.  (Dabish Decl. ¶ 5.)  On August 14, 2012, Instrastate sold

20   1,872 cases of Clearly Canadian beverages (in raspberry and black cherry flavors) to

21   Grayco.  (*Id.* ¶¶ 5-6, Attachs. A, B.)  The order totaled approximately $10,000.00, and

22   was shipped to Grayco in Ontario, Canada, on August 15, 2012.  (*Id.*; Colley Dep. at

ORDER- 10

1    33:15-18).)  Grayco displayed and sold Clearly Canadian beverages during the 2012

2    Canadian National Exhibition.  (3/30/12 Colley Letter.)  This fair, which runs from mid-

3    August to Labor Day, typically receives over 1.5 million attendees.  (*Id.*)  In October,

4    2012, Grayco sold 720 cases of Clearly Canadian beverages to an online retailer called

5    Beverages Direct, and transported the product to Beverages Direct in the United States.

6    (Colley Dep. at 39:343:9; 66:11-24; 79:15-79; Khan Dep. at 79:21-80:6 (referencing a

7    Grayco invoice dated October 23, 2012, to Beverages Direct).)  In turn, Beverages Direct

8    sold the Clearly Canadian product exclusively to retail purchasers located in the United

9    States.  (Colley Dep. at 91:6-92:4.)

10          In the summer of 2013, Intrastate sold another approximately $10,000.00 worth of

11   Clearly Canadian product to Grayco.  (*Id.* at 32:22-2; 67:1-17.)  Grayco again sold

12   several pallets worth of the beverage to Beverages Direct, and reserved the balance for

13   the 2013 Canadian National Exhibition.  (*Id.* at 67:1-17.)

14          Since then, Clearly Food's 2014 online pre-sales campaign has generated over

15   10,000 orders, resulting in over 27,000 cases of product due to be shipped in 2015.  (2d

16   Khan Decl. ¶ 4.)  Over 90% of those transactions are with customers in the United States.

17   (*Id.*)  Clearly Food has also received eight "full truckload" orders from seven different

18   beverage distributors.  (*Id.* ¶ 5.)  As a result, Clearly Food will ship over 30,000 bottles of

19   Clearly Canadian product in 2015.  (*Id.*; *see also* Billick Decl. Ex. N (invoices for the

20   purchase orders).)  Clearly Canadian will be sold directly to consumers at grocery stores

21   within those distributors' networks.  (2d Khan Decl. ¶ 5.)  Clearly Food has deployed

22

ORDER- 11

1  various online, social media, and other marketing campaigns.  (Khan Dep. at 46:12-19;

2  91:15-92:2; 95:8-15.)

3  **b.  Application**

4  Contrary to Top Shelf's contention, Clearly Food's evidence, viewed as a whole,

5  shows that intermittent, yet appreciable commercial sales of Clearly Canadian beverages

6  occurred from 2009 through the present.  The court concludes that a jury considering this

7  evidence could reasonably find that those sales are sufficient to preclude a finding that

8  use of the trademark was discontinued.  *See Electro Source, LLC*, 458 F.3d at 939

9  ("Good faith nominal or limited commercial sales of trademarked goods are sufficient . . .

10  to avoid abandonment[] where the circumstances legitimately explained the paucity of

11  the sales.")  Specifically, a jury could find that the scope of trademark and business

12  activity in which CC Beverage and Clearly Food engaged from 2009 to the present were

13  commercially reasonable given the situation:  namely, a brand transfer, during

14  bankruptcy proceedings, by a declining business to a start-up company seeking to

15  revitalize the brand.  *See Electro Source, LLC*, 458 F.3d at 939 (finding no abandonment

16  because a struggling business's efforts to exhaust its remaining inventory prior to

17  dissolution constituted "core trademark activities that necessarily contemplate trading

18  upon the goodwill of the mark").  Even a "single instance of use is sufficient against a

19  claim of abandonment of a mark if such use is made in good faith," *Wells Fargo & Co.*,

20  758 F.3d at 1072, and Clearly Food puts forth evidence of multiple uses arguably made in

21  good faith.  Although Top Shelf adduces evidence suggesting that the sales made

22  immediately after Clearly Food acquired the trademark were made solely for the purpose

1  of preserving the mark, the court may not weigh the evidence on summary judgment. *See*

2  *Reeves*, 530 U.S. at 150; (Ledden Decl. Ex. 4 ("10/2/12 Khan Email"), Ex. 5 ("3/15/12

3  Khan Email"), Ex. 9 ("12/22/11 Khan Email"); Khan Dep. at 51:20-52:6.)  As such,

4  when evidence of all Clearly Canadian sales between 2009 and the present is taken into

5  account, summary judgment on the issue of non-use is inappropriate.

6      In its reply brief, Top Shelf contends for the first time that sales to third-party

7  retailers or distributors do not constitute use in commerce within the meaning of the

8  Lanham Act because such sales are not uses by or for the benefit of the trademark owner.

9  (Reply (Dkt. # 102) at 4-5.)  Top Shelf bases its argument on two twenty-year-old

10  opinions by the Trademark Trial and Appeal Board ("TTAB") that stated:  "A party

11  cannot defend against a claim of abandonment by relying on some residual goodwill

12  generated through post-abandonment sales of the product by distributors or retailers."

13  *Parfums Nautee Ltd.*, 22 U.S.P.Q.2d 1306 (P.T.O. Jan. 15, 1992); *Societe Des Produits*

14  *Marnier Lapostolle*, 10 U.S.P.Q.2d 1241, at *4 n.5 (P.T.O. Feb. 10, 1989) (finding a

15  presumption of abandonment when the last shipment of trademarked products to the

16  United States occurred more than three years prior, despite the fact that retailers

17  continued to sell the product thereafter).

18      Top Shelf does not explain how these TTAB rulings fit into Ninth Circuit

19  jurisprudence regarding abandonment.[2]  (*See* Reply.)  More importantly, in the Ninth

20

21  _____

22  [2] The court is aware of only one district court in this circuit that has followed those rulings.  *See*
*Zamacona v. Ayvar*, No. CV0702767ABCFMOX, 2009 WL 279073, at *2 (C.D. Cal. Feb. 3, 2009); *but
see Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1189 (5th Cir. 1980) (finding no abandonment because

1  Circuit, new issues and evidence may not be raised in reply briefs.  *See Bazuaye v. I.N.S.*,

2  79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are

3  waived.").  Because Clearly Food has not had an opportunity to respond to Top Shelf's

4  newly raised argument, and because, as explained below, consideration of the argument

5  would not change the outcome of this motion, the court declines to decide the issue at this

6  time.  *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (stating that a court

7  should not consider new issues or evidence submitted in a reply brief without giving the

8  opposing party an opportunity to respond).[3]

9       Even if the court agreed that Clearly Food could not rely on sales by unaffiliated

10 retailers or distributors, summary judgment on the abandonment claim would not be

11 appropriate.  It is undisputed that Clearly Canadian beverages were sold in the United

12 States by or on behalf of Clearly Canadian to Paw Paw in September 2009, and to

13 Beverages Direct in October 2012.  (*See* Bogen Decl. ¶ 5, Attach. A; Colley Dep. at 39:3-

14 43:9; 66:11-24; 79:15-79: Khan Dep. at 79:21-80:6.); *Star-Kist Foods, Inc. v. P.J.*

15 *Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985); 15 U.S.C. §1127.  A jury could

16

17 "[t]here was no evidence that [the mark owner] intended to abandon its trademark; moreover, its products
    were still in interstate commerce at the time of the registration, since they were still on distributors'
18 shelves at that time"); *Am. Motors Corp.*, 178 U.S.P.Q. (BNA) ¶ 377 (P.T.O. Apr. 27, 1973) (finding no
    abandonment because although the trademark owner had discontinued the product, there was a
19 "considerable reservoir of goodwill in the mark" that inured to the owner "as a consequence of the large
    number of [trademarked] vehicles still on the road," among other things).

20       [3] For the same reasons, the court STRIKES all of the new evidence that Top Shelf filed in support
    of its reply brief (Dkt. # 103).  *See Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1273 (9th Cir. 1993) (striking
21 portions of a reply brief that presented new information); *Nautilus Grp., Inc. v. Icon Health & Fitness,
    Inc.*, 308 F. Supp. 2d 1208, 1214 (W.D. Wash. 2003) (striking a declaration with new evidence submitted
22 in reply).  The court does not consider that information in ruling on Top Shelf's motion for summary
    judgment.

1    reasonably find that the gap between these sales constitutes non-use or gives rise to a

2    presumption of abandonment.  *See Abdul-Jabbar*, 85 F.3d at 411; *but see* (Dabish Decl.

3    ¶¶ 5-6, Attachs. A, B (recording an intervening August 2012 sale by Intradistrict to

4    Grayco); Khan Dep. at 49:4-19 (stating that Clearly Food entered the license agreement

5    with Grayco because Grayco could obtain the financing necessary to produce Clearly

6    Canadian bottles).)  But even if a jury found non-use or a presumption of abandonment,

7    Clearly Food has set forth sufficient evidence to raise a question of material fact

8    regarding the second prong of abandonment:  intent to resume use of the mark.

9         Multiple documents, as well as Mr. Khan's deposition testimony, evidence Clearly

10   Food's intent to resume use of the Clearly Canadian trademark in commerce, beginning

11   as early as August 2011 and continuing to the present day.  (*See, e.g.*, 8/23/11 Khan

12   Email ("[W]e are acquiring Clearly Canadian.  We are bringing back the original legacy

13   line in its premium original glass teardrop bottle (6 flavors) . . . . Goal 1:  re-introduce

14   Clearly Canadian by January 1, 2012."); 2012 Bus. Plan (detailing Clearly Food's

15   product development and pricing, marketing, sales, and distribution strategies, with a

16   goal to "enter full-scale commercial production by March 2013 for North America");

17   Ledden Decl. Ex. 15 ("1/21/12 Kahn Email") ("Everyone here sees it as a national

18   mission to put [Clearly Canadian] back where it belongs."); Kahn Dep. at 91:15-93:19.)

19   Of course, "nothing in the statute entitles a registrant who has formerly used a mark to

20   overcome a presumption of abandonment arising from subsequent non-use by simply

21   averring a subjective affirmative 'intent not to abandon.'  *Electro Source, LLC*, 458 F.3d

22   at 937.  Clearly Food, however, also puts forth evidence of affirmative steps it took

1   during 2012 to resume using the Clearly Canadian mark in commerce, including seeking

2   out manufacturing and distribution retail partners, lining up investors, and creating a

3   business plan.  (*See* 2012 Bus. Plan; 1/21/12 Kahn Email ("We are in diligence on

4   acquiring 1 to 2 Canadian bottling production facilities."); Ledden Decl. Ex. 16 (email

5   soliciting investors), Ex. 17 (email seeking a retail partner); Dabish Decl. ¶ 6 (stating that

6   Mr. Khan contacted other distributors, co-packers, retailers, and sales professionals

7   regarding Clearly Canadian).  A jury relying on this evidence could reasonably find that

8   Clearly Food intended to resume use of the Clearly Canadian mark, and that therefore a

9   finding of abandonment was unwarranted.  *See Burgess v. Gilman,* 316 F. App'x 542,

10  544 (9th Cir. Sept. 4, 2008) (holding that trademark owner rebutted presumption of

11  abandonment by presenting evidence that it was "actively considering" and "repeatedly

12  reassessing" whether it would resume use of the trademark); *Lambert Corp. v. LBJC Inc.*,

13  No. 2:13-CV-00778-CAS, 2014 WL 2737913, at *9 (C.D. Cal. June 16, 2014) (holding

14  that trademark owner showed intent to resume use because she had "discussed a 're-

15  launch' with representatives of 'high-end' retailers, but ha[d] not yet executed the re-

16  launch because 'the right terms and conditions for doing so have not been determined'").

17  Consequently, summary judgment on this claim is inappropriate.

18        Finally, Top Shelf appears to argue in the alternative that the trademark was

19  abandoned by CC Beverage before Clearly Food purchased the trademark.  Because the

20  mark had not been out of use for more than three years at the time of the sale, Top Shelf

21  does not receive the benefit of a presumption of abandonment.  *See* 15 U.S.C. § 1127(1).

22  Neither party has pointed the court to evidence that would bear on CC Beverage's intent.

1    (*See* Mot.; Resp.)  The burden of proof on this claim, however, rests on Top Shelf.  *See*

2    *Abdul-Jabbar*, 85 F.3d at 411, n.4.  Although a jury could reasonably infer a lack of

3    intent to resume using the trademark based on CC Beverage's financial troubles, the court

4    cannot say a jury would be required to find a lack of intent.  *See Electro Source, LLC*,

5    458 F.3d at 941 ("If trademark protection were stripped the minute a company runs into

6    financial trouble or decides to liquidate, the two cornerstone interests in trademark would

7    be defeated—protection of the public through source identification of goods and

8    protection of the registrant's investment in the trademark.").  After all, as the Ninth

9    Circuit has noted, "[s]ome business and financial firms even specialize in rescuing

10   troubled companies, rehabilitating the business, and capitalizing on their goodwill and

11   intellectual property, including trademarks." *Id.*  Therefore, the court finds that Top

12   Shelf has not carried its burden to "strictly prove" that the trademark was abandoned by

13   CC Beverage prior to its purchase by Clearly Food.  *See FreecycleSunnyvale*, 626 F.3d at

14   515.

15          In sum, abandonment is "generally a factual issue," and this case is no exception.

16   *See Electro Source, LLC*, 458 F.3d at 941 (reversing a grant of summary judgment

17   because the district court improperly weighed evidence and drew inferences against the

18   trademark owner).  For all the reasons discussed above, the court concludes that summary

19   judgment in Top Shelf's favor on the abandonment claim is inappropriate.

20   **D.    Fraud**

21          Top Shelf contends that Clearly Canadian's trademark registration should be

22   cancelled for fraud.  (Mot. at 12-14.)  A party who believes it has been harmed by a

ORDER- 17

1    trademark's registration may seek the cancellation of that trademark's registration on

2    certain specified grounds, including that the trademark was obtained by the commission

3    of fraud on the United States Patent and Trademark Office ("Trademark Office").  15

4    U.S.C. § 1064; *see also* 15 U.S.C. § 1119 ("In any action involving a registered mark the

5    court may . . . order the cancelation of registrations . . . .").  "When a trademark's

6    registration is cancelled, its owner is no longer entitled to the rights that flow from federal

7    registration, including the presumption that the mark is valid."  *Hokto Kinoko Co. v.*

8    *Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013)

9         To succeed on a claim for cancellation based on fraud, Top Shelf "must adduce

10   evidence of (1) a false representation regarding a material fact; (2) the registrant's

11   knowledge or belief that the representation is false; (3) the registrant's intent to induce

12   reliance upon the misrepresentation; (4) actual, reasonable reliance on the

13   misrepresentation; and (5) damages proximately caused by that reliance."  *Id.* (citing *Robi*

14   *v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990)).  A false representation in the

15   original trademark application or an affidavit accompanying a renewal application may

16   be grounds for cancellation if all five requirements are met.  *Id.*  Top Shelf, however,

17   "bears a heavy burden of demonstrating that a trademark should be cancelled."  *Id.*; *see*

18   *also Robi,* 918 F.2d at 1444.

19        Top Shelf bases its fraud claim on the declaration by Clearly Food's Chief

20   Executive Officer, Robert Kahn, that accompanied the June 28, 2012, application to

21   renew the Clearly Canadian trademark.  (*See* Mot. at 12-14.)  As required by Section 8 of

22   the Lanham Act, Mr. Kahn declared that the Clearly Canadian trademark "is in use in

commerce on or in connection with the goods and/or services identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce."[4] (Request Ex. F ("Renewal").)  Mr. Kahn attached as a specimen a photograph of an empty plastic bottle of Clearly Canadian peach-flavored sparkling water.  (*See id.*)  This beverage had been purchased in Michigan in 2011 by an affiliate of Mr. Khan.  (Khan Dep. 58:5-60:25.)

For the same reasons discussed in the preceding section, the court finds that questions of fact preclude a finding as to whether the Clearly Canadian trademark was in fact in use in commerce as of June 2012.  *See supra* § III.C.  Because Top Shelf cannot prove the first element—namely, that Mr. Kahn's declaration contained a false representation regarding a material fact—summary judgment is inappropriate on this claim.  *See Celotex*, 477 U.S. at 324.

Even assuming that the statement that the Clearly Canadian trademark was in use in commerce in June 2012 was false, Top Shelf fails to establish the second and third elements of fraud.  "Deception must be willful to constitute fraud."  *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009); *see also Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 996 (9th Cir. 2001) (holding that a trademark owner "can only be adjudicated to have filed a fraudulent [incontestability affidavit] if he acted with scienter").  Mr. Kahn testified in deposition that, although he knew Clearly Food itself was not manufacturing

---

[4] Federally registered trademarks remain in force for 10 years; between the 9th and 10th year of registration, an owner must file a renewal application under Section 9 of the Lanham Act, which must be accompanied by a Section 8 declaration that the mark is in use in commerce.  *See* 15 U.S.C. §§ 1058, 1059.

1    plastic bottles of Clearly Canadian beverages at the time he signed the declaration, he

2    believed that the Clearly Canadian product was still being sold by third parties in

3    commerce through 2011 (as shown by his affiliate's then-recent purchase of the specimen

4    bottle), and understood that such sales were sufficient to satisfy the Section 8 standard of

5    use in commerce.  (Khan Dep. 23:25-24:7; 61:1-25; 69:13-72:13.)  As such, there are

6    questions of fact as to whether Mr. Kahn knew the trademark was not being used in

7    commerce as required by Section 8 and intended to mislead the Trademark Office as to

8    that fact.  *See In re Bose Corp.*, 580 F.3d at 1246 (finding that the registrant did not

9    commit fraud when it filed a combined Section 8 and Section 9 affidavit stating that the

10   mark was in use in commerce where the registrant erroneously believed that the repairing

11   of damaged previously sold goods and returning the repaired goods to the customers

12   constituted use in commerce).

13        Top Shelf puts forth evidence suggesting that Mr. Kahn understood that Clearly

14   Canadian itself needed to use the trademark in commerce in 2012 in order to avoid

15   abandonment.  (*See, e.g.* 10/2/12 Khan Email; 3/15/12 Khan Email; 12/22/11 Khan

16   Email; Khan Dep. at 51:20-52:6.)  The court, however, is not permitted to weigh the

17   evidence or make credibility determinations at this stage.  *See Reeves*, 530 U.S. at 150.

18   Although deceptive intent may be inferred from indirect and circumstantial evidence, *see*

19   *In re Bose Corp.*, 580 F.3d at 1246, the court cannot say that a jury considering Top

20   Shelf's evidence could only reasonably find a willful intent to deceive.  *See Far Out*

21   *Prods., Inc. v. Oskar*, 247 F.3d 986, 996 (9th Cir. 2001) (finding that the defendants "did

22   not even meet their initial burden in moving for summary judgment" because they "did

ORDER- 20

1    not present any evidence of the affiant's state of mind, including whether he acted in bad

2    faith or with knowledge").  At trial, a jury may well find that Top Shelf has carried its

3    "heavy burden" to show fraud.  *See Hokto Kinoko Co.*, 738 F.3d at 1097.  At this

4    juncture, however, the court finds that summary judgment is inappropriate.  *See Celotex*,

5    477 U.S. at 324; *Hokto Kinoko Co.*, 738 F.3d at 1097 (declining to cancel a trademark for

6    fraud where the challenger "adduced no evidence that [the registrant] knew of the

7    misstatement . . . or intended to defraud the [Trademark Office]").

8    **E.    Infringement**

9          Top Shelf also moves for summary judgment on Clearly Food's trademark

10   infringement claims.  (*See* Mot. at 19-22.)  To assess whether a defendant has infringed a

11   plaintiff's trademark, courts apply a "likelihood of confusion" test that asks whether use

12   of the plaintiff's trademark by the defendant is likely to cause confusion or to cause

13   mistake, or to deceive as to the affiliation, connection, or association of the two

14   products."[5]  *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 806-07 (9th

15   Cir. 2003); *see also  New W. Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194, 1201 (9th

16   Cir. 1997).  "The test for likelihood of confusion is whether a 'reasonably prudent

17   consumer' in the marketplace is likely to be confused as to the origin of the good or

18   _____

19        [5] Clearly Food brings claims under both Section 32 of the Lanham Act, 15 U.S.C. § 1114(1), and
     Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1).  (*See generally* Compl.)  Although Section 32
     provides protection only to registered marks and Section 43 provides protection to unregistered marks,
20   with respect to proving infringement, the same "likelihood of confusion" standard applies to both
     provisions.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000); *Brookfield
     Commc'ns, Inc., v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046-47 n.8 (9th Cir.1999).  As such, the
21   court's analysis of the "likelihood of confusion" standard is independent of the prospective outcome of
     Top Shelf's cancellation-of-registration claim.  *See Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d
     1088, 1108 (9th Cir. 2004) ("Ultimately, very little turns on the cancellation-of-registration claim because
22   registration is not necessary to establish trademark protection under federal . . . law.").

1    service bearing one of the marks." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135,

2    1140 (9th Cir. 2002).

3         The Ninth Circuit has developed an eight-factor test to guide courts in assessing

4    likelihood of confusion.  *Id.* (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49

5    (9th Cir.1979), *abrogated on other grounds by Mattel Inc. v. Walking Mountain Prods.,*

6    353 F.3d 792, 810 n.19 (9th Cir. 2003)).  The non-exclusive factors include (1) strength

7    of the protected mark, (2) proximity and relatedness of the goods, (3) type of goods and

8    degree of consumer care, (4) similarity of the protected mark and the allegedly infringing

9    mark, (5) marketing channel convergence, (6) evidence of actual consumer confusion, (7)

10    the defendant's intent in selecting the allegedly infringing mark, and (8) likelihood of

11    product expansion.  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir.

12    2014).

13         The "ultimate question of likelihood of confusion is predominantly factual in

14    nature, as is each factor." *Entrepreneur Media*, 279 F.3d at 1141.  Rather than

15    mechanically identifying the number of factors that favor of each party, a court must

16    "consider what each factor, and—more importantly—what the analysis as a whole,

17    reveals about the ultimate question . . . : the likelihood of consumer confusion as to the

18    origin of the product or service bearing the allegedly infringing mark." *Id.*  At the end of

19    the day, "it is the totality of facts in a given case that is dispositive." *Pom Wonderful*

20    *LLC*, 775 F.3d at 1125.

21    //

22    //

1    ### 1.  Similarity of the marks

2    "The greater the similarity between the two marks at issue, the greater the

3    likelihood of confusion."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th

4    Cir. 2000).  The Ninth Circuit has "developed three axioms that apply to the 'similarity'

5    analysis:  1) Marks should be considered in their entirety and as they appear in the

6    marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and, 3)

7    Similarities weigh more heavily than differences."  *Entrepreneur Media, Inc.*, 279 F.3d at

8    1144.

9    First and foremost, the court notes that both marks appear in the marketplace

10   primarily as labels on the bottles of single-serve beverages.  (*See* Mot. at 21 (showing

11   pictures of the trademarks alone and as used on bottles).)  The salient differences are that

12   the Clearly Canadian logo is screen printed, whereas the Clearly Kombucha logo is a

13   paper label, and the Clearly Canadian bottle has a "teardrop" shape, whereas the Clearly

14   Kombucha label has a traditional "beer bottle" shape.  (*See* Ledden Decl. Ex. 21 (side-by-

15   side comparison of the bottled beverages).)  Second, the court notes that the appearance

16   of the trademarks as used on the bottle labels is not overly similar:  the Clearly Canadian

17   label has horizontal text and a picture of the fruit that represent's the beverage's flavor;

18   the Clearly Kombucha label has vertical text and an apparently whimsical drawing;  the

19   fonts are also different.[6]  (*See id.*)  Moreover, the logos as used separately from the

20   _____

21   [6] The previous version of the Clearly Kombucha bottle looked different:  that version used
     horizontal writing in a different font, the word "Clearly" was written in significantly larger text than the
     word "Kombucha,"  and the background consisted of brightly colored vertical stripes.  (*See* Whittaker

22   Decl. Exs. N, O.)

1 bottles are not overly similar:  Clearly Canadian's logo consists of blue, horizontal text,

2 and a red bottle with a maple leaf; Clearly Kombucha's label is a black, oversized letter

3 "C" with the work "Clearly" written vertically inside the "C" and the word "kombucha"

4 written in a different font outside of the "C."  (*Compare* Ledden Decl. Ex. 19 *with*

5 Ledden Decl. Ex. 20.)

6       On the other hand, the sound of the trademarks is quite similar:  both begin with

7 the word "clearly" and end with a word that begins with a phonetic hard "c" sound.  *See*

8 *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d

9 1369, 1372 (Fed. Cir. 2005) (finding that the first word in the trademark constituted the

10 "dominant feature in the commercial impression" created by the mark).  In addition, as

11 Clearly Food points out, the common word "clearly" is the operative word in both

12 trademarks:  the Trademark Office required both registrants to disclaim rights to the use

13 of the words "Canadian" and "kombucha" without the preceding word "clearly."  (Req.

14 for Not. Ex. C; Ledden Decl. Ex. 2 (Appendix A).)  Last, the meaning of the trademarks

15 is also similar, insofar as they both rely on the word "clearly" to describe an aspect of

16 their product.  (*See* Zarrow Dep. at 16:22-17:2.)

17       Overall, the court finds that the third axiom—that similarities weigh more heavily

18 than differences—controls the result here.  Although Top Shelf has identified certain

19 differences between the marks, a reasonable jury could find that the similarities in how

20 the marks are used in the marketplace and the sound and meaning of the marks outweigh

21 those differences.  *See Entrepreneur Media, Inc.*, 279 F.3d at 1144.  Therefore, the court

22

ORDER- 24

1  concludes that a reasonable jury could find that the marks are similar.  As such, for

2  summary judgment purposes, this factor weighs in Clearly Food's favor.

3  **2. Marketing channels**

4  Here, there is evidence that both companies market and sell their beverages over

5  the Internet through their own websites, third party retail sites, and Facebook.  (*See*

6  Zarrow Dep. at 51:24-52:5; Cargle Dep. at 83:21-25; Khan Dep. at 46:12-19; 91:15-92:2;

7  95:8-15.)  Yet, "[g]iven the broad use of the Internet today, the same could be said for

8  countless companies." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d

9  1020, 1028 (9th Cir. 2004).  "*Some* use of the Internet for marketing . . . does not alone

10  and as a matter of law constitute overlapping marketing channels." *Entrepreneur Media,*

11  *Inc.*, 279 F.3d at 1151.

12  The parties hotly contest whether the two products would typically be stored in the

13  same shelves, aisles, or general areas of a retail store.  (*See* Mot. at 22 (contending that

14  Clearly Kombucha must be located in the refrigerated section); Supp. Resp. (Dkt. # 94) at

15  10-11 (contending that Clearly Kombucha appears on warm shelves).)  Because the court

16  must weigh the facts in the light most favorable to Clearly Food, the court assumes for

17  the purposes of this motion that retail stores would choose to display Clearly Kombucha

18  products near Clearly Canadian products more often than not, which weighs in favor of

19  finding of likelihood of confusion.  (*See* Billick Decl. Ex. I (restocking notes from 2013

20  showing that retail stores stocked Clearly Kombucha on warm shelves and next to bottled

21  water products such as Perrier, Smart Water, Vitamin Water, Evian, and Fiji, as well as

22  next to flavored beverages such as Snapple and Sobe), Ex. J.)  The significance of the

1   potential adjacent storage, however, is blunted by the fact that Clearly Canadian is not

2   currently sold in any brick and mortar retail stores.  Clearly Food has recently engaged a

3   sales and marketing company to market Clearly Canadian "to the top twenty-five grocery

4   store chains across the United States," and expects that Clearly Canadian will be sold in

5   unspecified grocery stores in 2015.  (2d Khan Decl. ¶¶ 3, 5.)  However, it remains unclear

6   whether Clearly Canadian will be sold in similar retail stores as Clearly Kombucha, or in

7   the same geographic region as Clearly Kombucha, in the near or intermediate future.

8   (*See* Zarrow Dep. at 27:21-28 (explaining that Clearly Kombucha was sold in limited

9   stores on the West Coast).)

10        In sum, a reasonable jury could not find that the parties' current marketing

11   channels "overlap to any significant degree."  *See Entrepreneur Media, Inc.*, 279 F.3d at

12   1151.  Future overlap, although possible, is speculative, and the minor existing overlap in

13   Internet use is insignificant because the "shared use of a ubiquitous marketing channel

14   does not shed much light on the likelihood of consumer confusion," *Network Automation,*

15   *Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011).  Therefore, the

16   court finds that this factor merits little weight in the likelihood of confusion analysis, and

17   what weight it does merit benefits Top Shelf.  *Id.*

18        **3.  Relatedness of the goods**

19        "Related goods are generally more likely than unrelated goods to confuse the

20   public as to the producers of the goods."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d

21   1199, 1207 (9th Cir. 2000).  "Related goods are those products which would be

22   reasonably thought by the buying public to come from the same source if sold under the

1    same mark." *Entrepreneur Media, Inc.*, 279 F.3d at 1147.  The Ninth Circuit applies "a

2    sliding scale approach as to the weight that relatedness will carry dependent upon the

3    strength of the trademark holder's mark."  *Entrepreneur Media, Inc.*, 279 F.3d at 1147.

4         Clearly Food identifies the following undisputed similarities between the two

5    products.  To begin with the obvious, Clearly Canadian and Clearly Kombucha are

6    single-serve, bottled beverages.  (*See* Ledden Decl. Ex. 21.)  Moreover, both products are

7    "sparkling" (carbonated) beverages, and are marketed as such.  (*See* Dkt. # 47-4 (2014

8    presentation to Clearly Canadian investors); Billick Decl. (Dkt. # 95) Ex. A (a December,

9    2010 "Gourment California Foods Product Brief" identifying Clearly Kombucha's "core

10   position" as a "lightly sparkling" beverage), Ex. B (2009 business plan to market Top

11   Shelf Kombucha as "the world's first luxury sparkling elixir"), Ex. C (October 2013

12   email from Ms. Zarrow to a potential distributor describing Clearly Kombucha as a

13   "sparkling, fermented, nonalcoholic tea"), Ex. D (2013 business plan describing Clearly

14   Kombucha as a "sparkling fermented tea"), Ex. E, Ex. F at 3, Ex. G ("Brand

15   Ambassador" handbook instructing marketers demonstrating Clearly Kombucha in retail

16   stores to "[a]sk EVERY person that walks by if they would like a sample of 'sparkling

17   tea'" unless the person already had kombucha in his or her cart).)  Additionally, both

18   products are "clear" beverages, and are marketed as such.  (*See* Cargle Dep. (Dkt. # 57-3)

19   at 37:1-25; Cargle Decl. ¶¶ 12-13; Zarrow Dep. at 12:20-24; 16:22-25.)  Finally, both

20   products are perceived as healthy alternatives to other carbonated beverages, such as

21   soda, and marketed as such.  (*See* Ledden Decl. Ex. 8 ("2007 Survey"); Dkt. # 47-4 (2014

22   presentation to Clearly Canadian investors); 2012 Bus. Plan; Billick Decl. Ex. D (Clearly

1    Kombucha 2013 business plan) at 9), Ex. E (notes from a Clearly Kombucha marketing

2    demonstration).

3          Top Shelf points out that Clearly Kombucha differs from Clearly Canadian in that

4    it is a flavored fermented tea rather than flavored water.  (*See* Mot. at 22.)  Top Shelf

5    attempts to further distinguish the products by emphasizing the affirmative health

6    benefits allegedly associated with kombucha, as well as the fact that Top Shelf targets a

7    "niche" health-conscious demographic.  (*See* Mot. at 21-23.)  However, "the relatedness

8    of each company's prime directive isn't relevant."  *Brookfield Commc'ns, Inc. v. W.*

9    *Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999).  Rather, "the focus is on

10   whether the consuming public is likely somehow to associate [the alleged infringer's]

11   products with [the mark owner]."  *Id.*; *see also Am. Int'l Group, Inc. v. Am. Int'l Bank*,

12   926 F.2d 829, 832 (9th Cir. 1991).

13         Viewing the evidence in the light most favorable to Clearly Food, the court

14   concludes that a jury could reasonably find that the consuming public is likely to

15   associate the Clearly Kombucha product with the Clearly Canadian brand.  The thrust of

16   Top Shelf's argument is that the two brands do not directly compete for customers.  But

17   even if a jury concluded that the two brands do not directly compete, a jury could still

18   reasonably find that the similarity of their products—namely, clear, sparkling, single-

19   serve beverages—would likely result in consumer confusion between the brands and

20   products.  *See American Int'l Group, Inc.*, 926 F.2d at 832 (concluding that although the

21   parties were not direct competitors, customer confusion could result in light of the

22

1   similarities between the financial services offered by the parties).  Therefore, for

2   summary judgment purposes, this factor weighs in Clearly Food's favor.

3   **4.  Strength of Clearly Canadian's mark**

4   "The more likely a mark is to be remembered and associated in the public mind

5   with the mark's owner, the greater protection the mark is accorded by trademark laws."

6   *GoTo.com, Inc.*, 202 F.3d at 1207.  The "'strength' of the trademark is evaluated in terms

7   of its conceptual strength and commercial strength." *Id.*  "Marks can be conceptually

8   classified along a spectrum of increasing inherent distinctiveness." *Id.*  "From weakest to

9   strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or

10  fanciful." *Id.*  For purposes of this motion, the court concludes that a jury could

11  reasonably find that the Clearly Canadian trademark is either descriptive or suggestive.

12  *See Entrepreneur Media*, 279 F.3d at 1141-42 ("Descriptive marks define qualities or

13  characteristics of a product in a straightforward way that requires no exercise of the

14  imagination to be understood.  A suggestive mark is one for which a consumer must use

15  imagination or any type of multistage reasoning to understand the mark's significance,

16  the mark does not *describe* the product's features, but *suggests* them.").

17  "Although a suggestive or descriptive mark is inherently a weak mark, it may be

18  strengthened by such factors as extensive advertising, length of exclusive use, [and]

19  public recognition." *Id.*  Clearly Food claims that its mark enjoys substantial public

20  recognition to this day.  (Resp. at 16.)  In support of that claim, Clearly Food provides

21  evidence that the Clearly Canadian mark has been in use since 1989 (Ledden Decl. Ex. 6

22  ("2014 Marketing Pres."); that CC Beverage sold millions of dollars worth of Clearly

1   Canadian beverages yearly through 2007 (although sales dwindled substantially after

2   1992) (*id.*); that Clearly Canadian's Facebook page has received over 35,000 "Likes" by

3   members of the public (Screenshot (Dkt. # 57-6)); and that in November 2014, a daily

4   Internet comedy show with in excess of one million subscribers discussed the Clearly

5   Canadian beverages for four-and-a-half minutes (*see* Resp. at 13 (citing the Good

6   Mythical MORE YouTube Channel at

7   https://www.youtube.com/channel/UCzpCc5n9hqiVC7HhPwcIKEg (last accessed April

8   28, 2015)); Sewer Adventures Episode November 10, 2014, http://youtu.be/2ajd-

9   vy_JM4?t=6m50s (last accessed April 28, 2015).  A jury could reasonably find that this

10  evidence of public recognition so strengthens the mark as to tip this factor in favor of

11  finding a likelihood of confusion.[7]  *See Entrepreneur Media, Inc*, 279 F.3d at 1141-42

12  (finding that monthly sales of half a million products could strengthen a descriptive mark

13  such that the factor weighed in favor of likely confusion).  However, this evidence is by

14  no means overwhelming; a jury could also reasonably find that the mark remained weak.

15  Therefore, the court concludes that, for summary judgment purposes, this factor weighs

16  only slightly in Clearly Food's favor.

17

18          ───────────────────

19          [7] Here, Clearly Food contends—but provides no evidence showing—that the Clearly Canadian
        mark is incontestable. (Resp. at 2.)  The incontestable status of a mark serves as conclusive proof that the
        mark has secondary meaning. *Entrepreneur Media, Inc.*, 279 F.3d at 1142, n.3.  Therefore, an
20      incontestable mark cannot be challenged as invalid on the basis that the mark is descriptive and has not
        acquired secondary meaning.  *Id.*  If the Clearly Canadian mark is incontestable, Top Shelf's arguments
        that the mark is not entitled to protection because it is descriptive must fail.  (*See* Mot. at 24.) The
21      incontestable status, however, does not require a finding that the mark is strong for infringement
        purposes.  *Entrepreneur Media, Inc.*, 279 F.3d at 1142, n.3.  Therefore, the relative strength or weakness
22      of an incontestable mark is still relevant to the likelihood of confusion analysis.  *Id.*

1     **5.  Actual confusion**

2        "Evidence of actual confusion is strong evidence that future confusion is likely."

3 *Entrepreneur Media, Inc*, 279 F.3d at 1150.  However, "the converse is not true."

4 *GoTo.com, Inc.*, 202 F.3d at 1208.  Nonetheless, a "reasonable juror may . . . find *de*

5 *minimis* evidence of actual confusion unpersuasive as to the ultimate issue of likelihood

6 of confusion."  *Id.*

7        Here, the parties present conflicting evidence as to confusion.  Top Shelf relies on

8 a survey taken by its expert, Dr. Thomas Maronick, in which "the majority of

9 respondents . . . said that Clearly Kombucha is either not affiliated with or sponsored by

10 any other company organization, or they 'don't know.'"  (Ledden Decl. Ex. 18

11 ("Maronick Rep.") at 9.)  For its part, Clearly Food presents evidence of actual consumer

12 confusion:  in five separate instances, written comments from consumers encountering

13 Top Shelf's products online have expressed the belief that Clearly Kombucha and Clearly

14 Canadian are affiliated.  (*See* Whittaker Decl. Exs. M (comment asking Clearly

15 Kombucha, "are you no longer making Clearly Canadian, too?"), N (comment next to

16 picture of Clearly Kombucha bottles:  "instead of clearly Canadian it's clearly

17 Kombucha!"), O (comment next to picture of Clearly Kombucha bottles:  "I've heard of

18 (and loved) Clearly Canadian, but never Clearly Kombucha!"); Ledder Decl. Ex. 13

19 ("Silverman Rep.") ¶ 47 (referencing consumer queries posted on Clearly Kombucha's

20 Facebook page asking, "Are you producing Clearly Canadian too?  You are the same

21 company yes?" and "Why are you pushing only Clearly Kombucha? Your Clearly

22 Canadian should be on top!  I used to drink you all the time growing up.").)  Clearly Food

1    also identifies various flaws in Top Shelf's survey that Clearly Food claims require the

2    expert's opinion to be discounted.  (Resp. at 25-26 (pointing out that a majority of the

3    survey respondents also answered that Clearly Kombucha *was* affiliated with another

4    company, or they "don't know").)

5          The court is not permitted to weigh the evidence on summary judgment.  Although

6    a jury could reasonably find that Clearly Food's evidence was de minimus, a jury could

7    also reasonably credit Clearly Food's evidence of actual confusion over Top Shelf's

8    survey.  *See Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir.

9    1992) (finding that one letter from a confused consumer plus evidence of retailer

10   confusion was sufficient evidence for a trier of fact to find actual confusion).  Therefore,

11   for summary judgment purposes, this factor weighs in Clearly Food's favor.

12      **6.  Likelihood of expansion**

13         Clearly Food claims that it intends to release a sparkling tea beverage in the

14   United States that will overlap with the Clearly Kombucha product.  (Mot. at  24. (citing

15   Khan Dep. at 106-08). )  However, Clearly Food fails to provide any supporting evidence

16   for that assertion.  The pages of Mr. Khan's deposition to which Clearly Food cites do not

17   discuss expansion plans into sparkling tea beverages or otherwise.  (*See* Khan Dep. at

18   106-08 (discussing whether Mr. Kahn believed Clearly Canadian-branded air fresheners

19   would infringe his company's trademark.)  "[M]ere speculation is not evidence."

20   *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005).  Clearly

21   Food's "complete inability to adduce any concrete evidence of expansion plans tilts this

22   factor in favor of" Top Shelf.  *Id.*

1      **7. Consumer degree of care**

2      "In analyzing the degree of care that a consumer might exercise in purchasing the

3  parties' goods, the question is whether a 'reasonably prudent consumer' would take the

4  time to distinguish between the two product lines. *Survivor Media, Inc.*, 406 F.3d at

5  634. "[T]he standard used by the courts is the typical buyer exercising ordinary caution .

6  . . . [W]hen the goods are expensive, the buyer can be expected to exercise greater care in

7  his purchases . . . ." *Network Automation, Inc.*, 638 F.3d at 1152.

8      Again, the parties present conflicting evidence as to the degree of care consumers

9  of their products are likely to exercise. Top Shelf's expert opines that kombucha is a

10  "niche product" and that the price point of Clearly Kombucha is high enough, relative to

11  other bottled beverages, to foster a relatively greater degree of care among consumers.

12  (*See* Silverman Rep. ¶¶ 55-56.) Top Shelf's founder testifies that its clients are

13  particularly health-conscious, and therefore are more discerning when choosing bottled

14  beverages. (Cargle Decl. ¶ 20.) On the other hand, Clearly Canadian points to evidence

15  showing that Top Shelf's beverages have been sold at a variety of price points, ranging

16  on the low end from $1.50 to $3.00. (*See* Supp. Resp. at 12-13).

17      "With respect to small, inexpensive goods . . . the consumer is likely to exercise

18  very little care." *Surfvivor Media, Inc*, 406 F.3d at 634; *see also CytoSport, Inc. v. Vital*

19  *Pharm., Inc.*, 617 F. Supp. 2d 1051, 1076 (E.D. Cal. 2009) (finding a low degree of care

20  with respect to bottled drinks costing between $3.00 and $5.00). A jury reviewing the

21  parties' evidence could reasonably find that consumers purchasing Clearly Canadian and

22

1 Clearly Kombucha beverages exercise a low degree of care.  Therefore, for the purposes

2 of summary judgment, this factor weighs in Clearly Food's favor.

3 **8.  Defendant's intent**

4 "[A]n intent to confuse customers is not required for a finding of trademark

5 infringement."  *GoTo.com, Inc*, 202 F.3d at 1208.  Accordingly, this factor is of "minimal

6 importance."  *Id.* (declining to attempt to divine the defendant's intent).  Clearly Food

7 establishes that Top Shelf's founders were aware of the Clearly Canadian brand, product,

8 and trademark at the time they adopted the Clearly Kombucha mark, which weighs in

9 favor of infringement.[8]  *See* (Whittaker Decl. Ex. B ("Cargle Dep.") at 99:17-101:22);

10 *Surfvivor Media*, 406 F.3d at 634.  For its part, Top Shelf's founder testifies that the

11 intent in changing the name of its product to Clearly Kombucha was both to emphasize

12 the "clear" nature of its product, which is the result of a filtration system that removes

13 floating solids ordinarily found in kombucha, as well as to "reflect transparency in the

14 brewing process."  (Cargle Decl. ¶¶ 12-13; Zarrow Dep. at 16:22-17:2.)  This minimal

15 evidence does little to aid a jury's determination of intent.  Because this factor is

16 "minimally important," the court concludes that this factor is neutral for the purposes of

17 summary judgment.  *See GoTo.com, Inc*, 202 F.3d at 1208.

18 **9.  Summary**

19 The Ninth Circuit has consistently observed that, "[b]ecause of the intensely

20 factual nature of trademark disputes, summary judgment is generally disfavored in the

21 ────────────────

22 [8] Although Clearly Food contends that Top Shelf purchased bottles of Clearly Canadian in August of 2011 in order to mimic their labeling, Clearly Food puts forth no evidence supporting this assertion.  (*Compare* Resp. (citing Whittaker Decl. Ex. P) *with* Whittaker Decl. (omitting Exhibit P).)

1  trademark arena." *Entrepreneur Media, Inc*, 279 F.3d at 1140.  That observation holds

2  true here.  The court finds that, on this record, a majority of the factors—namely, the

3  similarity of marks, the relatedness of the products, the strength of the mark, actual

4  confusion, and consumer degree of care—raise questions of material fact that a jury could

5  reasonably resolve in Clearly Food's favor.  More importantly, the court finds that, taking

6  the evidence in the light most favorable to Clearly Food, a jury evaluating the totality of

7  the circumstances could find that these factors show a likelihood of confusion between

8  the Clearly Canadian and Clearly Kombucha products and marks.  *See Pom Wonderful*

9  *LLC*, 775 F.3d at 1125.  Because a reasonable jury could find a likelihood of confusion as

10  to the origin of the Clearly Kombucha beverages, summary judgment on Clearly Food's

11  trademark infringement claim is inappropriate.  *See Mattel*, 353 F.3d at 806-07;

12  *Entrepreneur Media*, 279 F.3d at 1141.

13  **F.    Dilution**

14       "Dilution" refers to the "whittling away of the value of a trademark" when the

15  mark is used to identify different products.  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d

16  894, 903 (9th Cir. 2002).  "A plaintiff seeking relief under federal anti-dilution law must

17  show that its mark is famous and distinctive, that defendant began using its mark in

18  commerce after plaintiff's mark became famous and distinctive, and that defendant's

19  mark is likely to dilute plaintiff's mark."[9] *Levi Strauss & Co. v. Abercrombie & Fitch*

20  *Trading Co.*, 633 F.3d 1158, 1169 (9th Cir. 2011) (quoting *Visa Int'l Serv. Ass'n v. JSL*

21  
22  
_____
[9] There are two types of dilution:  dilution by blurring and dilution by tarnishment.  15 U.S.C.
§ 1125(c)(2)(B), (C); *Mattel, Inc.*, 296 F.3d at 903.

1  *Corp.*, 610 F.3d 1088, 1089-90 (9th Cir. 2010)).  Top Shelf challenges only one element

2  of this test; specifically, Top Shelf contends that Clearly Food cannot show that the

3  Clearly Canadian mark is famous.  (Mot. at 18.)

4       "[A] mark is famous if it is widely recognized by the general consuming public of

5  the United States as a designation of source of the goods or services of the mark's

6  owner."  15 U.S.C. § 1125(c)(2)(A).  To determine the degree of fame a mark retains,

7  courts look to the following four non-exclusive factors:

8       (i) The duration, extent, and geographic reach of advertising and publicity
        of the mark, whether advertised or publicized by the owner or third parties.

9

10      (ii) The amount, volume, and geographic extent of sales of goods or
        services offered under the mark.

11      (iii) The extent of actual recognition of the mark.

12      (iv) Whether the mark was registered under the Act of March 3, 1881, or
        the Act of February 20, 1905, or on the principal register.

13
   *Id.*; *see also Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 635 (9th Cir. 2008).

14
   Protection from dilution is a cause of action "reserved for a select class of marks—those

15 marks with such powerful consumer associations that even non-competing uses can

16 impinge on their value."  *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002,

17 1011 (9th Cir. 2004).  For this reason, protection from dilution extends "only to those

18 whose mark is a 'household name.'"  *Id.*

19
        Top Shelf puts forth the following evidence showing that Clearly Food cannot

20 prove that the Clearly Canadian mark was famous as of early 2011, the date the Clearly

21 Kombucha products were launched.  (*See* Mot. at 18-19; Cargle Decl. ¶ 14.)  A

22

1   consulting group's 2007 report on the Clearly Canadian trademark showed that only

2   34 % of the survey respondents who had consumed flavored soda or water within the last

3   month (and only 22% of the survey respondents overall) were aware of the Clearly

4   Canadian brand.  (*See* 2007 Survey at 4-5, 10, 22.)  This recognition rate was much lower

5   than the rate for competitors such as Aquafina (94%), Schweppes (77%), Perrier (76%),

6   VitaminWater (61%), and Pellegrino (43%).  (*Id.*)  The report concluded that, in 2007,

7   the brand was "in a good starting place for rebuilding."  (*Id.*)

8         Sales of the Clearly Canadian product, however, had declined steadily between

9   1992 and 2007, and between 2007 and 2009 they dropped to a minimal amount.  (*See*

10  2014 Investor Pres. at 14; Trustee's Rep. at 3 (stating that after 2005, CC Beverage

11  "struggled in the competitive beverage market" despite "attempts . . . to revive the

12  business").)  In 2009, production of Clearly Canadian beverages ceased.  (6/3/14 Khan

13  Email; 12/22/11 Khan Email.)  By 2010, CC Beverage "no longer ha[d] meaningful

14  operations."  (Trustee's Rep. at 3; 2012 Bus. Plan at 5 ("The brand . . . entered dormancy

15  in late 2010 . . . .")  Cybersquatters had taken over the Clearly Canadian website

16  domains.  (Ledden Decl. Ex. 10.)  Negligible sales of Clearly Canadian were occurring

17  on the secondary market.  (*See* Bogen Decl. ¶ 5, Attachs. A, B, C; Colley Dep. at 23:6-

18  15; 24:19-25:3.)

19        Clearly Food's responsive briefing does not mention its trademark dilution claim,

20  or otherwise attempt to rebut Top Shelf's contention that the Clearly Canadian mark was

21  not famous in early 2011.  (*See* Resp.)  The court will not sift through the record

22  searching for evidence on Clearly Food's behalf.  *See United States v. Dunkel*, 927 F.2d

1    955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")

2    The court finds that the evidence Clearly Food put forth to support its trademark

3    infringement claim is insufficient to raise a question of fact regarding the dilution claim.

4          Specifically, the facts that Clearly Canadian's social media page has received

5    35,000 "Likes" and an Internet comedy show recently discussed Clearly Canadian

6    beverages for four minutes, *see supra* § III.E, are insufficient to show that Clearly

7    Canadian was a "household name" to consumers in the United States in early 2011.  That

8    evidence does not remedy Clearly Food's failure to point the court to any affirmative

9    evidence showing the "duration, extent, and geographic reach of advertising and

10   publicity" of the Clearly Canadian mark; the "amount, volume, and geographic extent of

11   sales of goods or services offered under the mark"; or the "extent of actual recognition of

12   the mark." *See* 15 U.S.C. § 1125(c)(2)(A).  That evidence also cannot negate the fact that

13   the record currently before the court shows that, as of 2007, consumer awareness of the

14   Clearly Canadian brand was already low, sales up to that point had been lackluster, and

15   the brand's visibility only diminished from that point on.  *See Jada Toys, Inc.*, 518 F.3d

16   at 635 ("[A] reasonable trier of fact could conclude that the HOT WHEELS mark is

17   famous [because] it has been in use for over thirty-seven years; 350 million dollars have

18   been expended in advertising the mark; three billion HOT WHEELS units have been sold

19   since the inception of the mark; and HOT WHEELS are sold in all fifty states and

20   throughout the world.").

21         Accordingly, the court can only conclude that Clearly Food has failed to carry its

22   burden to put forth evidence from which a trier of fact could reasonably find in Clearly

1   Food's favor. *Celotex*, 477 U.S. at 324. Because no trier of fact considering the record

2   currently before the court could conclude that the Clearly Canadian trademark was

3   "widely recognized by the general consuming public of the United States" in early 2011,

4   summary judgment on the trademark dilution claim is appropriate. *See* 15 U.S.C.

5   § 1125(c)(2)(A).

6   **G.   State Law Claims**

7       Clearly Food also brings claims under Washington state law for trademark

8   infringement and unfair competition. (*See* Compl.) Top Shelf moves for summary

9   judgment in its favor on these claims as well. (Mot. at 26.) Top Shelf, however, fails to

10  set forth the applicable state law, or otherwise explain why the claims should be

11  adjudicated in its favor without a trial. (*See id.*) Instead, Top Shelf asserts that there are

12  no material issues of fact with respect to those claims "for the very same reasons [as]

13  discussed above with respect to Plaintiff's federal trademark infringement claims." (*Id.*)

14  Needless to say, Top Shelf has failed to carry its burden of production. *See Nissan Fire*

15  *& Marine Ins. Co.*, 210 F.3d at 1106. Summary judgment on the remaining state law

16  claims is not appropriate.

17  **H.   Motions to Seal**

18      In the course of briefing this motion, the parties have managed to generate an

19  inordinate number of motions to seal, some of which the court has granted. (*See*

20  *generally* Dkt.) At this time, three motions are still outstanding: Top Shelf's ex parte

21  motion to seal documents associated with its motion for summary judgment (Dkt. # 50);

22

ORDER- 39

1   Clearly Food's motion to seal documents associated with its responsive brief (Dkt. # 52);

2   and Top Shelf's motion to seal documents associated with its reply brief (Dkt. # 58).

3           Under the court's Local Rules, "[t]here is a strong presumption of public access to

4   the court's files."  Local Rules W.D. Wash. LCR 5(g); *see also Nixon v. Warner*

5   *Commc'ns, Inc*., 435 U.S. 589, 597 (1978).  Accordingly, a party must demonstrate

6   "compelling reasons" to seal judicial records attached to a dispositive motion.  *Kamakana*

7   *v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006).  "Only in rare

8   circumstances should a party file a motion, opposition, or reply under seal."  Local Rules

9   W.D. Wash. LCR 5(g)(5).

10          In an attempt to clarify the issues raised by the parties' remaining motions to seal,

11  the court directed the parties to provide a joint list identifying the docket number of each

12  document subject to a pending motion to seal.  (Dkt. # 110.)  Inexplicably, the parties

13  responded to the court's invitation by listing only the documents allegedly subject to the

14  motion to seal found at Docket. No. 101, which the court had already granted.  (*See* Dkt.

15  # 111.)  The court cannot help parties who refuse to help themselves.  Accordingly, the

16  court interprets the remaining motions to seal to the best of its ability, and rules as

17  follows.

18          First, the court interprets Top Shelf's motion at Docket No. 58 as a premature

19  motion to seal the subsequently filed reply brief (Dkt. # 102) and accompanying exhibits

20  (Dkt. # 103).  The court, however, has already stricken the evidence filed with Top

21  Shelf's reply brief from the record.  *See supra* § III.C n.3.  Therefore, Top Shelf's motion

22  to seal the exhibits found at Docket. No. 103 is moot.  The court also finds that Top Shelf

ORDER- 40

1   has not shown good cause to seal the reply brief itself.  *See Kamakana*, 447 F.3d at 1179.

2   The brief does not mention any trade secrets, confidential information, marketing

3   strategies, or business plans of either party.  "Only in rare circumstances should a party

4   file a motion, opposition, or reply under seal."  Local Rules W.D. Wash. LCR 5(g)(5).

5   Those circumstances are not found here.  Therefore, the court DENIES Top Shelf's

6   motion to seal found at Docket No. 58.  For completeness' sake, the court also STRIKES

7   the exhibits filed at Docket No. 59 because they are redundant to the exhibits filed at

8   Docket No. 103.

9       Second, the court refers to Clearly Food's response (Dkt. # 60) to Top Shelf's

10  motion at Docket No. 50 to determine which exhibits associated with Top Shelf's motion

11  for summary judgment should be sealed.[10]  *See* Local Rules W.D. Wash. LCR 5(g)(3)

12  (providing that the party that designated a document as confidential pursuant to a

13  protective order has the burden of showing it should be sealed).  The court concludes that

14  good cause exists to seal Exhibits 3, 4, 6-8, 11-15, 17, and 22 to Top Shelf's motion for

15  summary judgment, which are interspersed throughout Docket Nos. 47-1 through 47-16,

16  and 48.  The exhibits contain Clearly Food's confidential financial projections, marketing

17  _____

18  [10] Top Shelf erroneously filed this motion to seal as an ex parte motion.  (*See* Dkt. # 51
    (order directing Top Shelf to show cause why the motion was filed as an ex parte motion); Dkt. #

19  62 ¶ 13 (Top Shelf's response conceding that the "ex parte filing was the result of an error in
    procedure").)  Ordinarily, Clearly Foods would not receive notice of the court's ruling on an

20  opposing party's ex parte motion.  The court, however, finds it appropriate to provide Clearly
    Food notice of its ruling for three reasons:  (1) the ex parte restriction is an error, (2) the

21  operative document is Clearly Food's response, and (3) the motion concerns Clearly Food's
    confidential information.  Therefore, the court will address the substance of its ruling on the

22  putative ex parte motion in this order.  For docketing purposes only, a separate, non-public order
    ruling on the ex parte motion will follow this order.

1   strategies, and business plans, all of which could be used against Clearly Food by

2   competitors. *See Kamakana*, 447 F.3d at 1179.  However, the court finds that there is not

3   good cause to seal the motion itself; Clearly Foods has not shown that the motion

4   discloses confidential business information.  Accordingly, in a subsequent order, the

5   court will grant in part and deny in part Top Shelf's ex parte motion to seal found at

6   Docket No. 50.

7       A problem arises because Top Shelf has included documents that should be sealed

8   in the same pdf files as documents that should not be sealed.  (*See* Dkt. # 47-1 through

9   47-16.)  To remedy this problem, the court DIRECTS the clerk to maintain the seal on

10  Docket Nos. 47 and 48 in their entirety, and ORDERS Top Shelf to file unsealed versions

11  of Exhibits 1, 2, 5, 9, 10, 16, and 18-21 to Top Shelf's motion for summary judgment

12  within 10 days of the date of this order.

13      Third, the court refers to Top Shelf's response (Dkt. # 63) to Clearly Food's

14  motion to seal at Docket No. 52 to determine which exhibits associated with Clearly

15  Food's opposition should be sealed.  *See* Local Rules W.D. Wash. LCR 5(g)(3).

16  Although Clearly Food moved to seal the opposition and all exhibits filed with the

17  opposition, Top Shelf clarifies that only Exhibits C and E to the Whitaker Declaration

18  should be sealed.  (*See* Dkt. # 63.)  These exhibits, which are the depositions of Mr.

19  Cargle and Ms. Zarrow, are found at Docket Nos. 57-3 and 57-7, respectively.  The court

20  concludes that good cause exists to seal those exhibits:  both Mr. Cargle and Ms. Zarrow

21  testified about Top Shelf's business plans, marketing strategies, financial history and

22  projections, and other confidential information, and this information could be used

against their company by competitors.  *See Kamakana*, 447 F.3d at 1179.  Accordingly, the court GRANTS in part and DENIES in part Clearly Food's motion to seal at Docket No. 52.  The court directs the clerk to LIFT the seal on every document in Docket Nos. 54 through 57, with the exception of Docket Nos. 57-3 and 57-7, which shall remain under seal.

**I.     Motion to strike**

On the last page of its supplemental response, Clearly Food makes a desultory attempt to strike the expert report of Mr. Silverman on the basis that Mr. Silverman's opinion is premised on inadequate facts and/or factual inaccuracies.  (Supp. Resp. at 15.) Because the briefing on this subject is incomplete, the court denies the motion to strike as currently presented.

## IV.     CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendant's motion for summary judgment (Dkt. # 47).  The court STRIKES the exhibits filed at Docket Nos. 59 and 103.  The court DENIES Top Shelf's motion to seal (Dkt. # 58) and DIRECTS the clerk to LIFT the seal on Docket No. 102.  The court ORDERS Top Shelf to file unsealed versions of Exhibits 1, 2, 5, 9, 10, 16, and 18-21 to Top Shelf's motion for summary judgment within 10 days of the date of this order.  The court DIRECTS the clerk to LIFT the seal on Docket No. 47.

//

//

//

ORDER- 43

1    Finally, the court GRANTS in part and DENIES in part Clearly Food's motion to seal

2    (Dkt. # 52) and DIRECTS the clerk to LIFT the seal on Docket Nos. 54 through 57, with

3    the exception of Docket Nos. 57-3 and 57-7, which shall remain under seal.

4            Dated this 28th day of April, 2015.

5

6

7            _____

8            JAMES L. ROBART
             United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 44